UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

STEPHEN S. THOMPSON,

      Plaintiff,

vs.                                                                    Case No. 8:12-cv-1674-T-27AEP

UNITED STATES OF AMERICA,

      Defendant.
_____/

## ORDER

    **BEFORE THE COURT** is the Motion for Summary Judgment by Defendant United States

of America and Incorporated Memorandum of Law (Dkt. 34). Plaintiff, acting *pro se*,[1] has

responded (Dkts. 35 & 42). Upon consideration, the Motion (Dkt. 34) is GRANTED.

### PROCEDURAL BACKGROUND

    After being directed by the Court to file a Case Management Report (Dkt. 17), the parties

filed one on December 18, 2012 (Dkt. 20). A Case Management and Scheduling Order was entered

on January 4, 2013, setting a number of deadlines, including a discovery cut-off date of June 24,

2013, and a mediation deadline of August 18, 2013 (Dkt. 21 at 2). On July 29, 2013, Defendant filed

a Notice Regarding Mediation indicating that Plaintiff had served Defendant with several discovery

requests on the last day of discovery, June 24, 2013, to which Defendant objected based in part on

their untimeliness. (Dkt. 27). Defendant advised Plaintiff of its objections and inquired whether

Plaintiff would be prepared to go to the mediation scheduled for August 1, 2013. (*Id.* at 2). Plaintiff

indicated he would not be ready to mediate on the scheduled date or on the alternate date of August

14, 2013. (*Id.*).

---

[1] Plaintiff was admitted to the Oregon Bar in 1985 but resigned in 2002. (Dkt. 42 at 8-9; Dkt. 42-1 at 10).

On August 20, 2013, it appearing that Plaintiff had failed to comply with the Court's order requiring that the parties participate in mediation at least two weeks prior to September 1, 2013, Plaintiff was ordered to show cause as to why this case should not be dismissed and sanctions be imposed for failure to comply with the Case Management and Scheduling Order. (Dkt. 32). In his response, Plaintiff claims that Defendant's counsel has "unilaterally discontinued discovery without leave of the Court," therefore, Plaintiff had "no material to present to a mediator, or the Court." (Dkt. 33 at 3). Plaintiff requested "that the Court fashion an appropriate remedy to stop the continuing morass." (*Id.* at 4).

On August 27, 2013, Defendant moved for summary judgment on all of Plaintiff's claims. (Dkt. 34). Plaintiff initially responded to Defendant's Motion for Summary Judgment on September 9, 2013, but failed to address the merits of Motion. (Dkt. 35). Rather, he focused almost entirely on his contention that Defendant refused to participate in discovery. Plaintiff stated that "Defendant halted participation in discovery on June 24, 2013," and requested that the CMR be stricken and a new one be proposed. (*Id.* at 1, 8).

On October 23, 2013, Plaintiff filed "Defendant's Failure to Respond In A Timely Manner" in which he contends that because Defendant did not object or respond to his response to Defendant's Motion for Summary Judgment, it would be appropriate for the Court to conclude that Defendant has no objection to the resolution proposed in Plaintiff's response to the Motion for Summary Judgment--that the Motion for Summary Judgment be denied. (Dkt. 36). Plaintiff again requests that the CMR be stricken because of Defendant's disruption of its deadlines and a new one be proposed. (*Id.* at 3).

On November 29, 2013, Plaintiff filed a Request for Sanctions (Dkt. 37), which again takes issue with Defendant's alleged refusal to participate in discovery. In addition, Plaintiff requests that

the Court take judicial notice of Defendant's failure to object to Plaintiff's filing entitled "Defendant's Failure to Respond In A Timely Manner," which he now construes as a request to compel discovery, as well as Defendant's alleged failure to comply with various deadlines. Finally, he requests "direction" from the Court.

On December 23, 2013, after the Court provided notice to Plaintiff of the requirements of Rule 56 and gave him a deadline by which to file a further response (Dkt. 38), Plaintiff filed a second response to Defendant's Motion for Summary Judgment. (Dkt. 42). Plaintiff again focuses on his allegation that Defendant has not participated in discovery, but also responds to the merits of Defendant's Motion.

The Court has reviewed the filings in this case and ascertains no violation of any deadline by Defendant. Plaintiff served his discovery requests on the discovery cut-off date. The discovery cut-off date means that all discovery must be completed by that date. Middle District Discovery (2001) at 3.[2] Where a scheduling order has been entered, such "schedule shall not be modified except upon a showing of good cause." Fed. R. Civ. P. 16(b). Therefore, Defendant's alleged failure or refusal to participate in discovery does not provide grounds for striking the Case Management Report, compelling any discovery, imposing sanctions, or any other relief at this time and all of Plaintiff's requests to that effect are denied. Defendant's Motion for Summary Judgment is ripe for review.

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### *Standard*

Under Rule 56(a) of the Federal Rules of Civil Procedure, a court shall grant a motion for

---

[2] This Middle District of Florida Discovery Manual is available on-line at the following website: http://www.flmd.uscourts.gov/forms/Civil/Discovery_Practice_Manual.pdf.

"summary judgment if the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). However, once the movant has satisfied this burden, "[t]he burden then shifts to the nonmoving party to go beyond the pleadings and to present evidentiary materials designating specific facts that show a genuine issue." *Penaloza v. Target Corp.*, 2013 WL 5828008, *1 (11th Cir. 2013) (citing *Celotex*, 477 U.S. at 324). "When a nonmoving party's response consists of nothing more than conclusory allegations, summary judgment is not only proper but required." *Id.* (citing *Morris v. Ross*, 663 F.2d 1032, 1034 (11th Cir.1981)). "A *pro se* plaintiff must still meet the essential burden of establishing that there is a genuine issue as to a fact material to her case." *Id.* (citing *Holifield v. Reno*, 115 F.3d 1555, 1561 (11th Cir.1997)).

### *Plaintiff's Claims*

Plaintiff, a disabled veteran, brings this action against the United States under the Federal Tort Claims Act ("FTCA") and appears to allege negligence and violations of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). (Dkt. 1). Plaintiff's allegations of wrongdoing stem from a diagnosis of alcoholism by his primary care physician at the VA Outpatient Clinic PASCO in New Port Richey, Florida ("Pasco VA") and his attempts to have his records amended to remove this diagnosis. He also alleges wrongdoing related to two prescriptions for medication and disclosure of his medical information.

4

Plaintiff alleges that "the agents and employees of the United States of America at the Pasco

VA and James A. Haley Veterans' Hospital in Tampa Florida ("Haley VA"), deviated from

recognized standards of medical care in providing medical case and treatment to Plaintiff." (Dkt.

1, ¶ 57). He further alleges that the staff of the VA:

> failed to follow recognized standards of medical care in providing medical care to
> Plaintiff in the following manner:
>
> a. Negligently failed to provide proper pharmaceutical services;
> b. Negligently failed to provide proper medical care;
> c. Negligently failed to properly monitor Plaintiff's medical status;
> d. Negligently failed to obtain appropriate consultations;
> e. Negligently failed to properly maintain Plaintiff's medical records;
> f. Attempted to intimidate, threaten, coerce, and discriminate against Plaintiff in
> violation of the provisions of 45 CFR Section 164.530 (a)( l)(g) and other sections
> of 45 CFR and the United States Code;
> g. Improperly accessed Plaintiff's medical records;
> h. Concealed medication errors;
> i. Violated the provision of 45 CFR Section 164.528 by disclosing protected health
> information;
> j. Without proper consent; performed a substance abuse evaluation;
> k. Denied access to Plaintiff's medical records contrary to the provisions of 45 CFR
> Section 164.524 (a); 164.528 and related sections of CFR and the United States
> Code;
> l. In processing Plaintiff's request for amendment of his medical records failed to
> follow the mandates set forth in 45 CFR Section 164.526 and related sections of
> CFR and the United States Code;
> m. Failed to protect Plaintiff's confidential medical information as mandated by 45
> CFR Section 154.530 (a)(2)(g) and related sections of CFR and the United States
> Code.

(*Id.*, ¶ 58). The Court construes Plaintiff's Complaint, much as Defendant did, as alleging claims

for negligence, medical malpractice and violations of HIPAA.

### *Undisputed Facts*

### **Alcoholism Diagnosis and Disclosure of Plaintiff's Medical Information**

In March 2009, Plaintiff visited the Pasco VA as a new patient. (Dkt. 34-1 at 502; Dkt. 34-2

at 132-33).[3]  At that time, he attended a group orientation class where he watched the New Patient

Orientation Video and completed a new patient questionnaire. (Dkt. 34-2 at 135). The questionnaire

was given to one of Plaintiff's primary care team's registered nurses, Renee Stokes, to review and

input the data prior to his new patient appointment. (*Id.* at 126, 133). The questionnaire covered a

number of topics, including questions related to alcohol use. (*Id.* at 131-34). The Progress Notes

in Plaintiff's file indicate that Plaintiff provided the following responses to the alcohol related

questions:

  1.  How often did you have a drink containing alcohol in the past year?

      *Four or more times a week.*

  2.  How many drinks containing alcohol did you have on a typical day when

      you were drinking in the past year?

      *3 or 4*

  3.  How often did you have six or more drinks on one occasion in the past year?

      *Weekly*

(*Id.* at 132). Less than a week later, Plaintiff saw his assigned primary care physician, Dr. Kamla

Persaud-Reddy. (Dkt. 34-1 at 502). In the "HPI" section of the Progress Notes for that visit, Dr.

Persaud-Reddy wrote: "53 YO M with hx Alcoholism/seizure disorder/anxiety disorder . . . . He has

been drinking at least 4-5 beers daily." (*Id.*). In the "PMH" section, Dr. Persaud-Reddy listed

among other things, alcoholism. (*Id.* at 502-03). In the "Social Hx" section, she wrote "Ex cig

smoking/Drinks atleast [sic] 3-4 drinks daily/No alcohol use." (*Id.* at 504). She also noted that

Plaintiff "refuses to quit at this time depite [sic] knowing potential danger of taking anti seizure

medications and its interactions with alcohol. Pt aware that he could have a seizure, not willing to

---

[3] The page numbers cited are the Bates stamp numbers on the exhibit.

quit etoh at this time." (*Id.* at 505). Dr. Persaud-Reddy later included an addendum to the Progress Notes indicating that the words "no alcohol use" were entered in error. (Dkt. 34-2 at 125). Plaintiff subsequently requested a change in his primary physician, which he received. (*See* Dkt. 34-4; Dkt. 34-3).

On April 27, 2009, Plaintiff wrote Rhonda Aldridge, Privacy Officer at the James A. Haley Veterans Hospital, requesting that his medical records be corrected. (Dkt. 34-6 at 496). He explained that his interaction with Dr. Persaud-Reddy "deteriorated" after she told him that he was by definition an alcoholic and that his treatment would be modified to cope with the disease. (*Id.*). Plaintiff suggested several changes to his medical records, including removing most references to alcohol and deleting the diagnosis of alcoholism. (*See id.* at 497-99). However, one of Plaintiff's suggested changes was to remove only the words "at least" from the notes in his social history section that he drinks at least 3-4 drinks daily. He suggested changing the note to "Ex-cig smoking/patient reports 3-4 drinks daily." (*See id.* at 498). Finally, Plaintiff suggested that his answer to the question "How often did you have six or more drinks on one occasion in the past year?" be changed from "weekly" to "4-5 times." (*Id.* at 499).

Ms. Aldridge sent Plaintiff's requested amendment to Dr. Persaud-Reddy who did not agree that his requested changes should be made. (Dkt. 34-7). Dr. Persaud-Reddy wrote: "As per VA outline criteria > 14 drinks per week constitutes definition of alcoholism." (*Id.*). On June 5, 2009, the Director of the Haley VA sent a letter to Plaintiff stating that his requested amendment to his medical records was denied and providing instructions on how he could appeal. (Dkt. 34-8).

Months later, on February 18, 2010, Plaintiff wrote to Matt Peters, a Veteran Services Manager with the Department of Veteran Services, regarding Plaintiff's attempts to amend his medical records with respect to the diagnosis of alcoholism. (Dkt. 34-9 at 435). Plaintiff expressed his belief

that the use of the New Patient Questionnaire for diagnostic purposes is prohibited. (*Id.* at 436). Plaintiff also indicated that he was seeking information about the regulations and directives relating to use of information by the VA and VA record keeping. (*Id.* at 437). Apparently Mr. Peters forwarded this letter to Nancy Reissener, the Acting Medical Center Director of the Haley VA, because she sent Plaintiff a letter, "in response to [his] inquiry to Mr. Matt Peters addressing Plaintiff's concerns related to his diagnosis of alcoholism in his medical records. (*See* Dkt. 34-10). Her letter explains that Dr. William Miller, the Chief Medical Officer at the Pasco VA, had reviewed Plaintiff's inquiry, that the New Patient Questionnaire was reviewed by Plaintiff's provider to assist with basic background information, and that the provider was also able to view all VA Medical Records from all previous locations where a Veteran received care. (*Id.*). In addition, the letter states that in determining Plaintiff's alcoholism diagnosis, notes from his provider at the Southern Oregon White City VA Rehabilitation Center, which indicated a diagnosis of alcoholism, were used. (*Id.*).

After receiving Ms. Reissener's letter, Plaintiff wrote to Dr. Miller on April 28, 2010. In that letter, Plaintiff complained about Dr. Miller's review of Plaintiff's medical records, which was referenced in Ms. Reissener's letter to Plaintiff, and the dissemination of Plaintiff's medical information to individuals "who had no need to know." (Dkt. 34-16 at 416). On September 15, 2010, Plaintiff submitted another request to amend his medical records. (Dkt. 34-17). Dr. Reddy reviewed the request and did not agree that it should be made. (Dkt. 34-18). She wrote: "Pt did acknowledge drinking 3-4 alcoholic beverages daily. Also medical records from White City VA has a diagnosis of alcoholism." (*Id.*). The VA denied Plaintiff's request to amend on October 20, 2010.[4] (Dkt. 34-17).

---

[4] In his second response, Plaintiff claims that he did not submit a second request to amend his medical records. (Dkt. 42 at 8; Dkt. 42-1 at 10). However, Ms. Reissener's letter (Dkt. 34-17) and the Memorandum sent to Dr. Persaud-Reddy (Dkt. 34-18) regarding "Request for Amendment #00023," in which she denied the request, demonstrate otherwise. Nonetheless, whether Plaintiff made a second request is not material to the Court's conclusion regarding Plaintiff's claims.

### Prescription Medications

Plaintiff also claims a number of errors related to his prescription medications.  On April 1, 2009, Plaintiff wrote to Dr. Miller following up on a request to change his primary physician.  (Dkt. 34-4; *see* Dkt. 34-3).  He expressed concern that Dr. Persuad-Reddy had changed his pain medication prescription from codeine and aspirin to codeine and Tylenol and also indicated that there were two past incidences where he felt the "physician/patient ethical standards had been violated." (*Id.*).  On May 21, 2009, Plaintiff wrote Dr. Miller again explaining that he was mailed a month's supply of codeine and Tylenol which he returned, still sealed, to his new primary physician, Dr. Smith.  (Dkt. 34-5).  Dr. Smith subsequently changed Plaintiff's medication to codeine.  (*See id*; Dkt. 34-2 at 119).

On March 17, 2010, Plaintiff wrote Dr. Smith regarding some of his other prescriptions. Plaintiff stated that one of the two medications prescribed for a persistent skin irritation, that were to be used in conjunction, only had six refills, while the other had eleven.  (Dkt. 34-11).  Plaintiff noted that the prescription with six refills was incorrect and requested that Dr. Smith correct the refill number.  (*Id.*).  This "medication error" is described in Plaintiff's Complaint.  However, on July 13, 2010, Dr. Smith wrote in Plaintiff's Progress Notes that "Pt wrote [him] a letter . . . Pt also states that 2 topical preparations he has, which are to be used together, do not have equal nos of refills - - I checked and they both have 11 refills."  (Dkt. 2 at 53).

### *Medical Malpractice Claim*

"Under the FTCA, the United States is liable for tortious conduct 'in the same manner and to the same extent as a private individual under like circumstances' after applying the applicable law in the same jurisdiction." *Turner ex rel. Turner v. United States*, 514 F.3d 1194, 1203 (11th Cir. 2008)

(quoting 28 U.S.C. § 2674).[5]  Plaintiff's claims arose in Florida.  Under Florida law, "a plaintiff must establish the following: the standard of care owed by the defendant, the defendant's breach of the standard of care, and that said breach proximately caused the damages claims."  *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984).  To establish proximate cause, a plaintiff must prove that the defendant's negligence more likely than not caused the plaintiff's injury."  *Id.*

Pursuant to Florida Statutes, section 766.102, "[t]he prevailing professional standard of care for a given health care provider shall be that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers."  Fla. Stat. § 766.102(1).  Generally, "[i]n medical malpractice cases, the standard of care is determined by a consideration of expert testimony."  *See Pate v. Threlkel*, 661 So. 2d 278, 281 (Fla. 1995); *Bush v. United States*, 703 F.2d 491, 495-96 (11th Cir. 1983) (A determination regarding standard of care "usually necessitates expert testimony by those physicians who perform similar services in the community.").  However, "where only the exercise of common sense and ordinary judgment are required, a medical negligence action may be proved without the aid of expert medical testimony."  *Stepien v. Bay Mem'l Med. Ctr.*, 397 So. 2d 333, 334 (Fla. 1st DCA 1981) (citing *Atkins v. Humes*, 110 So. 2d 663 (Fla.1959)).  Plaintiff has not presented any expert testimony.[6]

---

[5] Plaintiff's Complaint alleges that he filed an administrative claim with the Office of General Counsel, Department of Veterans Affairs on March 1, 2011, which was denied on January 31, 2012. (Dkt. 1, ¶ 5.) Plaintiff filed the instant suit on July 26, 2012, less than six months after the denial of his administrative claim. *See* 28 U.S.C. §§ 2675, 2401(b); *also Burchfield v. United States*, 168 F.3d 1252, 1254 (11th Cir. 1999) ("A plaintiff bringing a claim against the United States under the FTCA must first present the claim to the appropriate federal agency and wait for the agency to finally deny it.")

[6] The expert disclosure deadline was May 24, 2013. (Dkt. 21).

Under the facts of this case, the alleged wrongdoing is not so obvious that common sense and ordinary judgment will suffice to determine whether the VA health professionals breached the standard of care owed to Plaintiff. Nor is the standard of care readily apparent. On this basis alone, judgment as a matter of law in favor of Defendant is appropriate.[7] Notwithstanding, the Court finds there is no evidence that any of the VA health professionals breached the standard of care owed to Plaintiff. As to Plaintiff's claims related to the diagnosis of alcoholism, Plaintiff's own suggested change to his records admits that he was drinking three to four drinks daily, or twenty-one to twenty-eight drinks per week. According to VA criteria, consuming more than fourteen drinks per week constitutes the definition of alcoholism. Moreover, there is no dispute that the record evidence demonstrates that the information Dr. Persaud-Reddy used in her diagnosis of Plaintiff also put Plaintiff's drinking within the VA's definition of alcoholism.[8]

As to Plaintiff's claims related to the alleged prescription medication errors, although Plaintiff contends that the codeine and Tylenol Dr. Persaud-Reddy prescribed is not recommended for him because of his elevated liver enzymes and concerns about liver toxicity, Plaintiff does not allege he actually ingested any of the pills. Further, Dr. Smith changed the prescription to codeine upon Plaintiff's request. Not only has Plaintiff failed to show that Dr. Persaud-Reddy breached the standard of care she owed Plaintiff by changing this prescription, he has also not shown that the codeine and Tylenol prescription caused him injury. Similarly, there is no evidence that demonstrates Plaintiff's skin cream prescriptions were incorrect or that the alleged error caused him any injury. Although

---

[7] To the extent Plaintiff's allegations can be construed to plead simple negligence, they do not demonstrate any duty owed to Plaintiff other than in the context of medical malpractice.

[8] In his Complaint, Plaintiff alleges that Dr. Persaud-Reddy retaliated against Plaintiff for his denial of her conclusion regarding alcoholism and that her religious beliefs influenced her treatment decisions related to Plaintiff's consumption of alcohol. (Dkt. 1, ¶¶ 20-21). Neither of these conclusory assertions are supported by the evidence.

Plaintiff alleges that one the two medications had an incorrect number of refills, Dr. Smith's notes refute that contention.

Plaintiff does not dispute that his medical records contain the information presented by the record. (Dkt. 35 at 2-3). His dispute goes to the accuracy of that information and the manner in which his appeal of it was processed (*see id.* at 3). These issues are the heart of his legal claims and do not create a dispute as to the material facts.[9] In sum, there is simply insufficient evidence from which a reasonable juror could find for Plaintiff, and Defendant is therefore entitled to judgment as a matter of law. *See Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003).[10]

### HIPAA Claim

Defendant is also entitled to judgment as a matter of law on Plaintiff's claim that Defendant violated his rights under HIPAA because HIPAA does not create a private right of action. *See Acara v. Banks*, 470 F.3d 569, 571-72 (5th Cir. 2006); *Sneed v. Pan Am. Hosp.*, 370 Fed. App'x 47, 50 (11th Cir. 2010); *Giarratano v. Judd*, Case No. 8:10-cv-2531-T-27TGW, 2012 WL 1191145, *4 (M.D. Fla. Apr. 10, 2012).

---

[9] In his second response (Dkt. 42), Plaintiff alleges that "due to the gross negligence of RN Stokes, multiple errors were introduced into Plaintiff's records when Plaintiff's questionnaire was transcribed," in that the information provided by Plaintiff in his questionnaire was "overstated by 400%." (Dkt. 42 at 4). Although Plaintiff made this allegation in his notice of intent to bring suit, Standard Form-95 ("SF-95 Form") (Dkt. 42-1 at 89), it is the first time he has made this allegation in a pleading in this case. Nonetheless, Plaintiff has not submitted any evidence other than his own statement to substantiate this claim. Furthermore, while Plaintiff disputes the accuracy of the information relied upon by Dr. Persaud-Reddy, he does not dispute that his records contain the information. Moreover, in his suggested changes to his medical records, he admitted drinking 3-4 drinks daily, enough to bring his drinking within the VA's definition of alcoholism.

[10] To the extent Plaintiff alleges a claim for intentional or negligent infliction of emotional distress, he has not established that the alleged conduct was outrageous, that he suffered physical injuries sustained in an impact, or that he suffered serve emotional distress. *See Lopez v. Target Corp.*, 676 F.3d 1230, 1236 (11th Cir. 2012) ("[O]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability."); *Florida Dep't of Corr. v. Abril*, 969 So. 2d 201, 206 (Fla. 2007) (To recover for negligent infliction of emotional distress, "some impact on the plaintiff, or, in certain situations, the manifestation of severe emotional distress such as physical injuries or illness," is required.).

Accordingly,

Defendant's Motion for Summary Judgment (Dkt. 34) is **GRANTED**.  The Clerk is directed

to enter judgment in favor of Defendant United States of America and against Plaintiff Stephen S.

Thompson.  The Clerk is further directed to terminate all pending motions and close the file.

**DONE AND ORDERED** this *13*ᵗʰ day of January, 2014.

JAMES D. WHITTEMORE
United States District Judge

Copies to:
Counsel of Record
Pro se Plaintiff